UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FIFTH THIRD BANK (CHICAGO), | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 3463 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| DANIEL A. STOCKS and DEBRA STOCKS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Fifth Third Bank (Chicago) brought this diversity suit against Daniel and Debra Stocks

("Daniel" and "Debra"), alleging breach of two loan guaranty agreements.  Doc. 8.  The Stocks

answered the complaint, asserted affirmative defenses, and brought a counterclaim.  Doc. 25.

The counterclaim was dismissed under Federal Rule of Civil Procedure 12(b)(6).  265 F.R.D.

316 (N.D. Ill. 2010) (Castillo, J.).  The court then denied Fifth Third's motion for summary

judgment on its claims, holding that the evidence presented a genuine issue as to whether Fifth

Third had breached the implied covenant of good faith and fair dealing, which the Stocks

pleaded as an affirmative defense.  720 F. Supp. 2d 1008 (N.D. Ill. 2010) (Castillo, J.).  Given

that disposition, the court found it unnecessary to address the Stocks' other affirmative defenses.

*Id*. at 1013 n.6.

The court then held a bench trial on Fifth Third's claims and the Stocks' affirmative

defenses.  Pursuant to Federal Rule of Civil Procedure 52, the court enters the following

Findings of Fact and Conclusions of Law.  To the extent that any Findings of Fact may be

considered Conclusions of Law, they shall be deemed Conclusions of Law, and to the extent that

any Conclusions of Law may be considered Findings of Fact, they shall be deemed Findings of

Fact.  After considering the admissible evidence and assessing the credibility of the trial

witnesses, the court concludes that the Stocks breached two valid guaranty agreements, and that

(1) Daniel is liable for $2.2 million, and (2) Daniel and Debra are jointly and severally liable for

$1,041,295.41, plus interest and collection costs.

### Findings of Fact

**A.**      **Background**

1.      Fifth Third Bank (Chicago) is a Michigan banking corporation with its principal

place of business in Illinois.  Doc. 90-1 at ¶ 1.

2.      The Stocks are residents and citizens of Indiana.  *Id*. at ¶¶ 2-3.

3.      Fifth Third seeks damages from the Stocks in excess of $75,000.  *Id*. at ¶ 4.

**B.**      **West Irving**

**1.**      **West Irving Credit and Guaranty Agreements**

4.      At all relevant times, Daniel owned controlling interests in West Irving Die, Inc.,

an Illinois corporation; West Irving Die Castings of Kentucky, LLC, a Kentucky limited liability

company; West Irving Building Corp., an Illinois corporation; West Irving Building Company of

Kentucky, LLC, a Kentucky limited liability company; and Quality Machining & Tooling, LLC,

an Illinois limited liability company (collectively, "West Irving").  *Id*. at ¶ 5.  The companies

were in the die casting business and primarily made parts for appliances.  Tr. 75:23-76:6

(Daniel).[*]

---

[*]  Because the parties did not order an official transcript, the court cites to the pagination
in the unedited "realtime" files created by the court reporter during trial.  If an official
transcript is prepared, its pagination will be slightly different than the "realtime"
pagination.

5.      On February 17, 2006, West Irving entered into a Credit Agreement ("West Irving Credit Agreement") with Fifth Third Bank.  Pl. Exh. B at 1.  As part of that agreement, West Irving had access to $22-24 million through a line of credit.  Pl. Exh. D at 1-2; Pl. Exh. E at 1-2; Tr. 79:25-80:1 (Daniel).

6.      The West Irving Credit Agreement was in writing and signed.  Tr. 187:10-22 (Bork).

7.      Although Fifth Third actively solicited West Irving's business, Tr. 79:8-22 (Daniel), the parties' relationship was considered to be that of a lender and a borrower, with Fifth Third and West Irving never forming a joint venture or a partnership, Tr. 187:2-9 (Bork).

8.      Under the terms of the West Irving Credit Agreement, Fifth Third advanced funds based on the amount of collateral assets controlled by West Irving.  Fifth Third would monitor the assets through a program called the Stuckey System, which identified West Irving's loan balances, daily sales, and collections.  Tr. 42:21-43:6, 53:6-25 (May).  The Stuckey System "would determine whether or not the value of [West Irving's] assets minus [its] line of credit gave [it] any availability to draw further on the line of credit."  Tr. 142:15-17 (Smith).

9.      From time to time, Fifth Third would debit West Irving's checking account without advance notice.  The debits were used to pay down West Irving's loan, to pay interest on the loan, to make West Irving's credit card payments, and to cover fees associated with certain financial transactions.  Tr. 149:6-12 (Smith).

10.      On the same day that the West Irving Credit Agreement was executed, Daniel entered into a Limited Guaranty Agreement ("West Irving Limited Guaranty") with Fifth Third. Doc. 90-1 at ¶ 6.

11.      The West Irving Limited Guaranty states, in relevant part:

> Guarantor [Daniel] hereby unconditionally guarantees to the Lender [Fifth Third], and its successors, endorsees, transferees and assigns, the prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of the Liabilities.  Guarantor agrees that this Guaranty is a guaranty of payment and performance and not of collection, and that its obligations under this Guaranty shall be primary, absolute and unconditional … .

> \* \* \*

> Notwithstanding anything herein to the contrary, the obligations of Guarantor hereunder shall be limited to the aggregate amount of $2,200,000, but only to the extent required to pay the Liabilities in full.

Pl. Exh. A at 2-3, 7.

12.     The West Irving Guaranty further provides: "This Guaranty, together with the other Loan Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to a guaranty of the loans and advances under the Loan Documents and/or the Liabilities and may not be amended or supplemented except by a writing signed by Guarantor and Lender." *Id*. at 8.

13.     The West Irving Guaranty was considered part of the Credit Agreement and was "an important factor to the bank from a collateral perspective." Tr. 31:6-15 (May).  Other collateral included "all assets of the [West Irving] companies." Tr. 42:16-20 (May).

14.     In December 2006, Daniel and Fifth Third entered into an amendment to the West Irving Guaranty.  Pl. Exh. B.  Other than the Omnibus Reaffirmation Agreement discussed below, Daniel and Fifth Third had no other written agreements concerning the West Irving Guaranty.  Tr. 120:3-6 (Daniel).

## 2.     Silverman Consulting

15.     In September 2006, West Irving hired Silverman Consulting to audit its expenditures and to help it "return to a profitable status." Tr. 90:24-91:12, 92:18-22 (Daniel).

Silverman was hired after West Irving had lost what Daniel called a "partner," had been forced to expend substantial sums of money to take over the partner's operations, and had defaulted on its Fifth Third loans.  Tr. 85:21-88:12 (Daniel).

16.     Fifth Third had recommended Alix Partners as "[a]n excellent choice" to serve as West Irving's consultant, but West Irving chose Silverman, saying: "Based on the discussions internally here, we are prepared to move forward with Silverman."  Pl. Exh. J.

17.     Silverman's engagement with West Irving lasted roughly seven months, and ended prior to July 2008.  Tr. 90:16-21 (Daniel); Tr. 41:20-42:2 (May); Tr. 192:15-20 (Bork).

18.     Silverman's primary recommendation for returning West Irving to profitability was to consolidate West Irving's two facilities into a single plant.  Tr. 92:22-24 (Daniel). Although West Irving discussed the recommendation with Fifth Third, Fifth Third rejected the proposal because it would have cost roughly $1.5 million to implement.  Tr. 93:4-6 (Daniel).

### 3.     Interest Rate Swaps

19.     In December 2006, West Irving participated in interest rate swaps through which it exchanged its variable interest rate for a fixed rate.  The transaction was facilitated by Fifth Third, Tr. 81:4-20 (Daniel), which acted as a middle-man between West Irving and a similarly situated entity with which West Irving swapped rates, Tr. 190:7-12 (Bork).

20.     West Irving engaged in roughly $12 million worth of swaps.  Tr. 84:8-12 (Daniel).  West Irving lost money as a result of the transactions—when interest rates rose, West Irving was obligated to make higher interest payments than if it had retained the fixed rate—and it maintains that Fifth Third forced it into swaps and is responsible for the monetary loss.  Tr. 85:15-16 (Daniel).

21.     Fifth Third did not benefit financially from the swaps. Tr. 211:20-23 (Bork). In fact, the swaps were "unwound," or canceled, and Fifth Third did not charge West Irving the $300,000 unwinding fee. Tr. 190:13-19 (Bork).

### 4.     The Reaffirmation Agreement

22.     On July 18, 2008, Daniel signed an Omnibus Reaffirmation Agreement, which reaffirmed the West Irving Credit Agreement and the West Irving Guaranty. Pl. Exh. C; Tr. 26:15-21 (May). Daniel signed the Reaffirmation Agreement in his personal capacity, as well as in his role as the representative of West Irving. Pl. Exh. C at 5; Tr. 27:6-10 (May).

23.     In the Reaffirmation Agreement, Daniel agreed to the following: "The Collateral Agreements [all guaranties, security agreements, assignments, and subordination agreements] constitute binding and valid obligations of each of the undersigned parties, and none of them have any set off, counterclaim or defense with respect to any of the Obligations described in the Loan Documents or the Collateral Agreements." Pl. Exh. C at 4.

24.     Daniel signed the Reaffirmation Agreement as consideration for Fifth Third making a $1 million loan to West Irving. Tr. 27:22-24 (May); Tr. 117:3-8 (Daniel). Half of that amount, or $500,000, was automatically advanced to G.I. Tech, another Stocks-controlled company, to reduce the "payable from West Irving to G.I. Tech." Tr. 177:2-12 (Smith). Contemporaneous financial documents show that G.I. Tech received $500,000 on July 28, 2008. Pl. Exh. M at 5, 7 (fund transfer with REF # 00202384106).

25.     West Irving and Fifth Third executed no other written loan agreements after July 2008. Tr. 117:17-19 (Daniel).

### 5.     Morris Anderson Consulting

26.     On October 31, 2008, West Irving hired a second consulting firm, Morris

Anderson & Associates, to evaluate its financial situation.  Pl. Exh. P; Tr. 39:8-14, 40:2-6 (May).

27.     At that time, West Irving was facing deteriorating economic circumstances—it

was losing money and "falling out of grace on [its] borrowing base"—and chose Morris

Anderson from among several consultants recommended by Fifth Third.  Tr. 58:17-21 (May);

Tr. 95:18-96:3, 97:7-11 (Daniel); Tr. 193:7-13 (Bork).

28.     Daniel maintains that Fifth Third forced West Irving against its will to retain

Morris Anderson.  Specifically, Daniel asserts that Fifth Third deliberately returned checks and

made it "difficult to work with [the bank] unless [and until West Irving] accept[ed] David

Mack," the consultant from Morris Anderson.  Tr. 96:13-21 (Daniel).

29.     Daniel's submission is without factual support.  Fifth Third did not manipulate its

clients' assets to ensure hiring decisions.  Tr. 194:17-195:4 (Bork).  And West Irving could not

identify, beyond naked assertions, why its checks bounced, the amounts of those checks, to

whom the checks were written, or the dates upon which the checks were returned, Tr. 168:4-21

(Smith).  The evidence belies West Irving's suggestion that it would capitulate to Fifth Third's

demands to hire Morris Anderson.

30.     In fact, West Irving engaged Morris Anderson, at least in part, because West

Irving had lost its largest customer (Toyota), was at risk of losing a second major customer

(General Motors), and was not receiving new business from its remaining customers.  Tr. 95:19-

25 (Daniel); Tr. 32:3-33:1 (May); Tr. 178:23-179:10 (Smith); Pl. Exh. R (email from David

Mack of Morris Anderson stating, "GM [General Motors] does not have any business to give and

did not feel comfortable enough with the new money and will not support a restructure or sale as

a going concern. We are now 100% focused on a Wind-Down Plan!!!"). After considering the relevant evidence, the court finds as a factual matter that West Irving voluntarily hired Morris Anderson.

31.     Morris Anderson issued a report on November 17, 2008. Pl. Exh. Q. The report stated that West Irving faced a "[s]evere lack of liquidity"; had a need for "[m]aterial over-advances" and to consolidate its plants; faced unprecedented automotive market downturn and general economic turmoil; and suffered from "[e]xtensive long term losses" as well as a lack of investors or buyers for its business. *Id*. at 4-5. The report's gist was that West Irving was "in deep financial difficulty." Tr. 124:18-21 (Daniel).

32.     Although West Irving considered itself salvageable through consolidation, Tr. 156:17-157:5 (Smith), the company's declining customer base and lack of funds caused it to default on its loans in late 2008, Tr. 31:22-32:2 (May); Tr. 169:23-170:15 (Smith) (noting that West Irving could not pay its debt "without the sale of [its] assets").

33.     As a result, "West Irving [was] sitting there without any money or any funds, unable to go forward without the bank." Tr. 100:21-22 (Daniel). It was "painfully obvious that the revenue stream had dried up after [General Motors] announced that they wanted to do an orderly exit as well." Tr. 160:13-18 (Smith). In fact, General Motors's decision "meant that [West Irving] could no longer salvage" itself. Tr. 173:9-11 (Smith).

34.     Given these economic circumstances, Fifth Third, Morris Anderson, and West Irving determined that West Irving should file an assignment for the benefit of creditors. Tr. 100:5-24 (Daniel); Tr. 157:25-158:5 (Smith). West Irving recognized that taking such action was the "most secure route and the shortest route" to protect its interests, even if it did not have full control over the decision. Tr. 107:7-12 (Daniel).

-8-

35.     Shortly before the assignment for the benefit of creditors was filed, a third party offered to purchase portions of the West Irving companies and their equipment.  Tr. 114:7-25 (Daniel).  The would-be purchaser, however, did not have funding to support the transaction and instead asked Fifth Third to finance the buyout; Fifth Third declined.  Tr. 198:15-199:10 (Bork); Tr. 110:15-22 (Daniel).  West Irving's equipment eventually was sold at auction, pursuant to the Uniform Commercial Code, for substantially less than the third-party had asked Fifth Third to lend.  Tr. 115:8 (Daniel); Tr. 218:14-219:25 (Bork).

36.     On December 12, 2008, a Kentucky court in *In the Matter of West Irving Die Castings, LLC and West Irving Die, Inc.*, Case No. 08-C01-6773 (Commonwealth of Kentucky, Jefferson District Court), entered an interim order appointing David Mack of Morris Anderson as assignee for the benefit of creditors of West Irving Die Castings of Kentucky, LLC, and West Irving Die, Inc.  Doc. 90-1 at ¶ 9; Tr. 102:24-103:1 (Daniel); Pl. Exh. T.

37.     Before authorizing the assignment for the benefit of creditors, Daniel spoke with Greg Bork, Vice President of Fifth Third's Structured Finance Group.  Daniel testified that Bork told him that "as long as you continue to cooperate and sign the assets over, I have no intentions of pursuing your personal guaranty."  Tr. 105:2-19 (Daniel); Tr. 161:21-24 (Smith).  Daniel testified that the G.I. Tech Guaranty (discussed below) was not mentioned during the discussion.  Tr. 136:10-12 (Daniel).  Daniel did not ask for anything in writing.  Tr. 174:14-22 (Smith); Tr. 200:22-201:4 (Bork).

38.     Bork flatly denies having promised Daniel that Fifth Third would not pursue Daniel under the West Irving Limited Guaranty in exchange for Daniel's cooperation with the assignment for the benefit of creditors process.  Tr. 199:17-200:4.  Bork explained that he did not have the authority to excuse a client's personal guaranty and that Fifth Third, as a matter of

policy, does not forgive guaranties before the underlying debt has been discharged as a means of ensuring cooperation. Tr. 200:5-21 (Bork). After considering the relevant evidence, the court finds as a factual matter that Bork's recollection of his discussion with Daniel is more accurate and credible than Daniel's recollection; that is, the court finds that Bork did not promise the bank would not pursue Daniel under the guaranty if Daniel cooperated with the assignment for the benefit of creditors process.

39.     On March 5, 2009, the Kentucky court entered a final order appointing Mack as assignee in the assignment for the benefit of creditors proceeding. Doc. 90-1 at ¶ 10; Pl. Exh. U.

40.     At the time of its 2008 default, West Irving owed Fifth Third $10,643,139. Pl. Exh. T at 9; Tr. 33:22-34:3 (May). West Irving now owes Fifth Third between $6 million and $8 million. Tr. 41:4-7, 45:1-5 (May); Tr. 116:12-15 (Daniel). Fifth Third remains a senior secured lender on that debt. Tr. 34:23-35:2 (May).

### C.     G.I. Tech

41.     In 2008, Daniel and Debra were members of G.I. Tech Group LLC, an Indiana limited liability company. Doc. 90-1 at ¶ 7. G.I. Tech assembled refrigerator motors and other refrigerator components for Whirlpool. Tr. 34:9-11 (May); Tr. 77:1-12 (Daniel).

42.     G.I. Tech also served as a vendor for West Irving, assembling products such as West Irving's die cast components. Tr. 150:5-11 (Smith).

43.     Throughout the relationship between West Irving and G.I. Tech, West Irving was slow to pay G.I. Tech, primarily because G.I. Tech was "a sister company" controlled by the Stocks. G.I. Tech also allowed West Irving "to stretch out [G.I.] tech group" payments: "while [G.I. Tech's] business was good, [it was] able to go ahead" without West Irving's payments. Tr. 150:21-151:5, 152:7-18 (Smith) (noting G.I. Tech was "low on the [payment] pecking order").

44.     West Irving never brought its debt to G.I. Tech below $900,000, and the debt sometimes reached as high as $1.2 million. Tr. 159:24-160:5 (Smith). G.I. Tech was not a secured creditor on any debt owed by West Irving. Tr. 163:18-19 (Smith).

45.     On March 5, 2008, G.I. Tech and Fifth Third entered into a Secured Credit Agreement ("G.I. Tech Credit Agreement") through which Fifth Third provided a line of credit up to $2.5 million. Pl. Exh. H. Fifth Third became a senior secured lender on all monies loaned to G.I. Tech. Tr. 34:18-19 (May).

46.     Also on March 5, 2008, Daniel and Debra entered into a Continuing Guaranty ("G.I. Tech Guaranty") with Fifth Third. Doc. 90-1 at ¶ 8; Pl. Exh. G. The G.I. Tech Guaranty states, in relevant part, that "the Guarantors absolutely and unconditionally guarantee to the Bank, as primary obligor and not merely as surety, that the Liabilities will be paid when due, whether by acceleration or otherwise. … The Guarantors' obligations under this Guaranty are joint and several, and unlimited in dollar amount." Pl. Exh. G at 1.

47.     Although she was equivocal on the issue, Debra testified that she felt some coercion to sign the G.I. Tech Guaranty and that she was concerned that if she failed to sign, G.I. Tech would lose Fifth Third's financial support. Tr. 63:15-20, 64:6-12 (Debra). Debra, however, never had any meetings, conversations, or communications with Fifth Third. Tr. 65:15-66:2 (Debra). In addition, Debra previously signed at least one other guaranty to Fifth Third on G.I. Tech's debt, dating back to June 30, 2002. Pl. Exh. Z. The court therefore finds as a factual matter that Debra's entry into the G.I. Tech Guaranty was knowing and voluntary.

48.     Fifth Third would not have entered into the G.I. Tech Credit Agreement without Debra and Daniel signing the G.I. Tech Guaranty. Tr. 35:16-25 (May).

49.     No other writings governed the Stocks' guaranty to Fifth Third relating to G.I. Tech.  Tr. 71:10-23 (Debra).

50.     On March 18, 2009, G.I. Tech entered into a Transition Agreement with its major customer, Whirlpool, through which Whirlpool began to move in-house the assembly work previously done by G.I. Tech.  Pl. Exh. V.  Fifth Third executed a Lender's Acknowledgment and Consent of the arrangement, which was attached to the Transition Agreement.  Doc. 90-1 at ¶ 11; Pl. Exh. V at 10; Tr. 66:3-8 (Debra).

51.     Once Whirlpool took its work in-house, G.I. Tech had little revenue and soon ceased to operate.  Tr. 37:13-38:2 (May).

52.     On April 16, 2009, G.I. Tech filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Southern District of Indiana.  *In re GI Tech Group, LLC*, Case Number 09-70548-BHL-7 (S.D. Ind.); Doc. 90-1 at ¶ 12; Pl. Exh. W.

53.     At the time of the bankruptcy petition, G.I. Tech owed Fifth Third $1,575,708.68.  Pl. Exh. I at 1.  By June 8, 2010, G.I. Tech owed Fifth Third $1,041,295.41.  Tr. 38:21-25 (May); Tr. 116:16-24 (Daniel).

**Conclusions of Law**

Fifth Third advances two claims: (1) Daniel breached the West Irving Guaranty; and (2) Daniel and Debra breached the G.I. Tech Guaranty.  Both instruments provide that Illinois law governs.  Pl. Exh. A at 9; Pl. Exh. G at 4.  The court therefore applies Illinois law.  *See H.B. Fuller Co. v. Kinetic Sys., Inc.*, 932 F.2d 681, 685 (7th Cir. 1991) ("[T]he law applicable to a contract is that which the parties intended. … When that intent is expressed, it should be followed") (quoting *Hofeld v. Nationwide Life Ins. Co.*, 322 N.E.2d 454, 458 (Ill. 1975)).

-12-

"In a suit brought on a collateral or continuing guarantee, such as the one sued on in this case, a *prima facie* case is made when the plaintiff enters proof of the original indebtedness, the debtor's default and the guarantee." *Mid-City Indus. Supply Co. v. Horwitz*, 476 N.E.2d 1271, 1277 (Ill. App. 1985); *see also Speed Boats of Texas, LP v. Bank of Am., N.A.*, 2011 WL 759955, at *4 (N.D. Ill. Feb. 25, 2011). This court previously concluded that Fifth Third "has produced evidence establishing a prima facie case for the enforcement of the Guaranties," and noted that "Defendants do not contest this evidence." 720 F. Supp. 2d at 1011. Again at trial, Fifth Third introduced probative evidence sufficient to establish a prima facie case for the enforcement of the guaranties.

Original indebtedness was established through the West Irving Credit Agreement and the G.I. Tech Credit Agreement. Pl. Exh. D at 1-2 ("As of July 18, 2008, Lender has loaned to Borrower the amount of $2,858,457.45"); Pl. Exh. E at 1-2 (a separate West Irving Loan Note in the amount of $3,125,958.81); Pl. Exh. H at 1 ("Lender has agreed … to make a term loan to Borrower in the principal amount of $2,300,000"). G.I. Tech's default was evidenced by its bankruptcy filing, which listed over $2 million outstanding to Fifth Third. Pl. Exh. Y at 8. In addition, a "Loan History Detail" dated March 31, 2011, shows that G.I. Tech continued to owe Fifth Third at least $1,041,295.41. Pl. Exh. I at 2. Proof of default as to West Irving was established through Daniel's affidavit in support of the assignment for the benefit of creditors, which attested that West Irving owed Fifth Third $10,643,139. Pl. Exh. T at 9. Additionally, Daniel testified at trial that West Irving still owed Fifth Third roughly $8 million and that G.I. Tech owes Fifth Third roughly $1 million. Tr. 116:12-24 (Daniel). As proof of the two guaranties, Fifth Third introduced the West Irving Limited Guaranty, signed by Daniel, and the G.I. Tech Guaranty, signed by Daniel and Debra. Pl. Exhs. A & G.

The Stocks assert four affirmative defenses to support their position that, despite Fifth Third's prima facie showing, neither guaranty should be enforced. The defenses are considered in turn.

### A.   Fraud

The first affirmative defense is fraud. To establish fraud, the Stocks must prove that: (1) Fifth Third made a false statement of material fact; (2) Fifth Third had knowledge or belief of the falsity; (3) Fifth Third intended to induce the Stocks to act; (4) the Stocks' actions were taken in justifiable reliance on the truth of Fifth Third's statements; and (5) the Stocks suffered damages as a result of their reliance. *See Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011); *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008). Each element must be established by clear and convincing evidence. *See Integrated Genomics*, 636 F.3d at 863 (citing *Avery v. State Farm Mut. Ins. Co.*, 835 N.E.2d 801, 856 (Ill. 2005)). In their trial brief, the Stocks argue that Fifth Third defrauded them by: (1) requiring West Irving to engage in interest rate swaps that resulted in roughly $500,000 in losses; (2) forcing West Irving to hire Silverman Consulting and then refusing to honor West Irving's checks unless and until Silverman approved them; (3) telling West Irving that it would receive $1 million, half of which would go to G.I. Tech, upon signing the Reaffirmation Agreement, and then refusing to send any money to G.I. Tech; (4) demanding that West Irving hire Morris Anderson, which forced West Irving to file an assignment for the benefit of creditors; and (5) representing to Daniel that the bank would not seek to enforce the West Irving Guaranty if he agreed to the assignment for the benefit of creditors. Doc. 90-6 at 34. Each argument fails.

### 1. Interest Rate Swaps and Silverman Engagement

West Irving engaged Silverman Consulting in September 2006. Tr. 90:24-91:12, 92:18-22 (Daniel). The engagement was terminated in early 2007. Tr. 90:16-21 (Daniel); Tr. 41:20-42:2 (May); Tr. 192:15-20 (Bork). The interest rate swaps occurred in December 2006. Tr. 81:4-21 (Daniel). Both the Silverman engagement and the interest rate swaps occurred before Daniel signed the Reaffirmation Agreement on July 18, 2008, in which he represented that the West Irving Guaranty remained valid and that there were no "set off[s], counterclaims[s] or defense[s] with respect to any of the Obligations described in the Loan Documents or the Collateral Agreements." Pl. Exh. C at 4.

The Reaffirmation Agreement defeats Daniel's fraud defense as it relates to the credit swaps and the Silverman engagement; it was executed after both events occurred, it explicitly provides that the loan and guaranty agreements remained valid and enforceable, and it disclaimed any "set off, counterclaim or defense." Fifth Third properly relied upon this reaffirmation of the West Irving Guaranty and Daniel's disclaimer of any defenses arising from prior events or circumstances. *See U.S. Shoe Corp. v. Hackett*, 793 F.2d 161, 165 (7th Cir. 1986) ("[Plaintiff] was entitled to rely on the guaranty as written, not as limited by the [defendants'] interpretation of its original purpose. Objective readings of financial instruments promote commercial transactions"); *Nat'l Jockey Club v. Ganassi*, 740 F. Supp. 2d 950, 961 (N.D. Ill. 2010) ("obligations under the guaranty became binding when he executed it, and he was not entitled to decide whether to reaffirm those obligations at a later date"); *Heller Fin. Leasing, Inc. v. Gordon*, 2005 WL 2756113, at *3 (N.D. Ill. Oct. 19, 2005) (where the guarantor-defendants reaffirmed that their loan and guaranties "constitute legal, valid and binding obligations enforceable in accordance with their terms by Lender against Borrower," "no reasonable trier of

-15-

fact could conclude that [lender-plaintiff] had not performed its contractual obligations owed under the Guarantees" or that prior events rendered the guaranties unenforceable).

### 2. $500,000 to G.I. Tech

The Stocks' contention that G.I. Tech never received the $500,000 promised in July 2008 in connection with the Reaffirmation Agreement is wrong as a factual matter. Charles Smith, West Irving's Chief Financial Officer, credibly testified that half of the $1 million advanced to West Irving in July 2008 was sent to G.I. Tech to satisfy the "payable from West Irving to G.I. Tech." Tr. 177:2-12 (Smith). Fifth Third also introduced persuasive documentary evidence that G.I. Tech received $500,000 on July 28, 2008. Pl. Exh. M at 5, 7 (fund transfer with REF # 00202384106).

### 3. Morris Anderson and the Assignment for the Benefit of Creditors

The Stocks' contention that West Irving was required to hire Morris Anderson, and that Morris Anderson forced West Irving into an assignment for the benefit of creditors, fails to establish fraud. This is so for three reasons. First, the Stocks have not identified a materially false statement upon which they relied. Second, the contention fails as a factual matter. Fifth Third, Morris Anderson, and West Irving considered alternative means to address West Irving's financial difficulties, including consolidation, Chapter 11 bankruptcy, and a wind down. Tr. 203:7-20; 214:19-215:8 (Bork). Contrary to the premise underlying the Stocks' contention, an assignment for the benefit of creditors was not preordained.

Third, even putting those two reasons aside, the Stocks have not demonstrated that they suffered damages as a result of their reliance on any materially false statement. It is true that West Irving ultimately stopped operating. But regardless of whether West Irving hired Morris Anderson, a different consulting firm, or no consulting firm at all, the company simply could not

have continued to operate without consolidation or new customers. Tr. 153:11-16 (Smith); Tr. 196:12-20 (Bork). Consolidation would have required between $1 million and $1.5 million to implement. Tr. 93:4-6 (Daniel). West Irving did not have the capital to finance a consolidation on its own, and Fifth Third had no contractual or other obligation to provide funding for the project. As to new business, West Irving had lost its largest customer (Toyota), was at risk of losing a second major customer (General Motors), and was not receiving new business from any of its remaining customers. Tr. 95:19-25 (Daniel); Tr. 32:3-33:1 (May); Tr. 178:23-179:10 (Smith); Pl. Exh. R (email from David Mack of Morris Anderson stating, "GM does not have any business to give and did not feel comfortable enough with the new money and will not support a restructure or sale as a going concern. We are now 100% focused on a Wind-Down Plan!!!"). In fact, Daniel testified that the loss of established business and the lack of new business left "West Irving[] sitting there without any money or any funds, unable to go forward without the bank." Tr. 100:21-22 (Daniel). Smith testified that it was "painfully obvious that the revenue stream had dried up," Tr. 160:13-18 (Smith), and "that [West Irving] could no longer salvage" itself, Tr. 173:9-11 (Smith). Given these realities, it did not matter which consultant (if any) West Irving hired, for it was no longer viable.

### 4. The Alleged Promise Not to Enforce the West Irving Guaranty

Finally, the fraud defense fails to the extent it rests on Bork's alleged oral promise not to enforce Daniel's guaranty obligations. As an initial matter, the court has found as a factual matter that no such promise was made. In any event, even if the oral promise had been made, Daniel's fraud defense would be barred by the Illinois Credit Agreements Act ("ICAA"), 815 ILCS 160/0.01 *et seq*. The ICAA provides, in relevant part, that an "agreement by a creditor to modify or amend an existing credit agreement or to otherwise take certain actions, such as

entering into a new credit agreement, forbearing from exercising remedies in connection with an existing credit agreement, or rescheduling or extending installments due under an existing credit agreement," unless in writing and signed by the creditor and debtor, "do[es] not give rise to a claim, counter-claim, or defense by a debtor that a new credit agreement is created." 815 ILCS 160/3(3). The alleged forbearance in this case—Bork's statement that "as long as you continue to cooperate and sign the assets over, I have no intentions of pursuing your personal property"—was never put in writing. Tr. 174:14-22 (Smith); Tr. 200:22-201:4 (Bork). It follows that the ICAA defeats Daniel's fraud defense to the extent it rests on Bork's statement. *See Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 225-26 (7th Cir. 1996) (holding that the ICAA barred the borrower's fraud affirmative defense, which arose from the lender's alleged oral promise to extinguish a debt obligation); *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 944 (7th Cir. 1993) (barring claims and defenses of the debtor based on an alleged oral promise by the creditor to forgive the unpaid balance of a loan); *LaSalle Bus. Credit, Inc. v. Lapides*, 2003 WL 722237, at *15 (N.D. Ill. Mar. 3, 2003) ("Courts have uniformly barred the claims and defenses of debtors which have relied on the existence of oral credit agreements.").

### B.     Breach of Fiduciary Duty

The second affirmative defense alleges that Fifth Third breached its fiduciary duty to the Stocks, West Irving, and G.I. Tech. The premise of the defense is that Fifth Third "became a de facto partner with" the Stocks and their companies when it solicited their business and entered into credit agreements with them, resulting in a fiduciary relationship. Tr. 237:25-238:5 (Defendants' closing argument). This defense fails as well.

"Fiduciary duties exist as a matter of law in certain relationships, including partnerships and joint ventures." *Autotech Tech. L.P. v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir.

2006). "The burden of proving the existence of a partnership or joint venture is on the person who claims such a relationship exists." *Ibid*. A "partnership" is "an association of 2 or more persons to carry on as co-owners a business for profit." 805 ILCS 206/101(f). To establish a partnership, the Stocks must demonstrate that the parties "(1) joined together to carry on a trade or venture, (2) for their common benefit, (3) with each contributing property or services to the enterprise, and (4) having a community of interest in the profits." *Autotech*, 471 F.3d at 748 (citing *Maloney v. Pihera*, 573 N.E.2d 1379, 1387 (Ill. App. 1991)).

The evidence does not support the Stocks' contention that Fifth Third joined together with the Stocks, West Irving, or G.I. Tech to carry on a trade or venture. Rather, the uncontroverted evidence establishes that the parties had typical lender-borrower and lender-guarantor relationships—Fifth Third did not become a co-owner of or investor in the entities that borrowed from it. The credit agreements, for example, do not indicate that West Irving or G.I. Tech were subject to joint control; there were no provisions for profit sharing or the division of losses; the parties did not file joint tax returns; and there was no written evidence of an intent to be associated as a partnership. *See Autotech*, 471 F.3d at 749.

Consequently, the evidence demonstrates that the parties' relationships were typical lender-borrower or lender-guarantor relationships. The relationship between a lender and a guarantor does not give rise to a fiduciary duty. *See Cont'l Bank, N.A. v. Modansky*, 997 F.2d 309, 313 (7th Cir. 1993) ("creditors are not fiduciaries to guarantors merely by virtue of that relationship"); *Brazell v. First Nat'l Bank & Trust Co. of Rockford*, 982 F.2d 206, 209 (7th Cir. 1992) ("a creditor is not ordinarily his guarantor's fiduciary"); *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119-20 (7th Cir. 1992) (same); *Farmer City State Bank v. Guingrich*, 487 N.E.2d 758, 763 (Ill. App. 1985) ("the relationship between a guarantor and

creditor is a debtor-creditor relationship rather than a fiduciary relationship"). The same is true of the relationship between a lender and a borrower. *See Flintridge Station Assocs. v. Am. Fletcher Mortg. Co.*, 761 F.2d 434, 442 (7th Cir. 1985) ("it would indeed be stretching the definition of fiduciary to hold that a bank, by lending money … owes a fiduciary duty to a borrower") (internal quotation marks omitted); *Citicorp Sav. of Ill. v. Rucker*, 692 N.E.2d 1319, 1325-26 (Ill. App. 1998) ("there is nothing inherent in business dealings between a lender and a borrower from which springs a cognizable fiduciary relationship"); *Bank Computer Network Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 442 N.E.2d 586, 594 (Ill. App. 1982) ("the debtor-creditor relationship between the two-parties created no fiduciary duty as a matter of law"); *Geimer v. Bank of Am., N.A.*, 784 F. Supp. 2d 926, 932 (N.D. Ill. 2011) ("the contractual relationship between a lender and a borrower is not fiduciary in nature").

There is no merit to the Stocks' suggestion that the parties' credit and guaranty contracts themselves gave rise to a fiduciary duty. "The normal trust between contracting parties does not operate to turn a formal, contractual relationship into a fiduciary relationship unless one of the parties places great trust in and relies heavily on the judgment of the other party." *Teachers Ins. & Annuity Ass'n of Am. v. LaSalle Nat'l Bank*, 691 N.E.2d 881, 888-89 (Ill. App. 1998). Because the Stocks have "not pointed to anything in the *written credit agreement* that would support a finding that [they] placed great trust in and relied on [Fifth Third] as to any of the terms in the written credit agreement" or the written guaranties, they cannot establish that a fiduciary relationship was created through those contracts. *Id*. at 889 (emphasis added).

In any event, the Stocks have not demonstrated how Fifth Third breached its supposed fiduciary duty to them or their companies. The Stocks intimate that the breach occurred when Fifth Third required West Irving to engage in interest rate swaps, to hire Silverman, and to hire

Morris Anderson.  As initial matter, these allegations touch solely on the West Irving-Fifth Third

relationship, and do not bear upon the G.I. Tech relationship.  And as discussed above, Daniel

and West Irving affirmed in the Reaffirmation Agreement that there were no claims or defenses

premised on the interest rate swaps or the Silverman engagement.  As to Morris Anderson, the

Stocks have failed to establish any causal relationship between the Anderson engagement and

the winding down of West Irving.  General Motors was unwilling to give new business, West

Irving had lost its largest customer and was experiencing severe cash flow difficulties, and it

could not operate without further financing from Fifth Third.  It was these circumstances that led

to West Irving's wind down, not the engagement of Morris Anderson.

### C.      Duty of Good Faith and Fair Dealing

The third affirmative defense alleges that Fifth Third breached its duty of good faith and

fair dealing.  In particular, the Stocks contend that "because [the parties' relationship] was not a

simple debtor-creditor relationship, [but] more of a partnership, … the bank owed these two

companies … a duty of good faith and fair dealing. … [And] certainly, the bank holds some

responsibility for what happened" to the companies.  Tr. 20:21-21:6 (Defendants' opening

statement).  That defense fails.

"Every contract implies good faith and fair dealing between the parties.  Good faith

between the contracting parties requires the party vested with contractual discretion to exercise it

reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable

expectations of the parties." *First Nat'l Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1069 (Ill.

App. 1990) (citations omitted).  Where, as here, a bank has the ability to advance funds on a

continuing basis, discretion exists. *See ibid.* ("It is plain that the Bank has some degree of

discretion in extending credit to [the borrower], because under the agreement, the Bank must be

satisfied that [the borrower's] inventory, accounts receivable, and other assets are sufficient to secure the additional money loaned. Whether the Bank exercised its discretion reasonably, however, [is] a question for the trier of fact."). In considering whether Fifth Third acted reasonably, "the trier of fact should consider, at a minimum, the profitability of [the borrower's] business and any evidence that [the borrower] was not in default." *Id*. at 1070.

Here, Fifth Third used the Stuckey System to monitor West Irving's and G.I. Tech's inventory, accounts receivable, and other assets in deciding whether to extend additional loan amounts. While the bank had a degree of discretion as to whether to make further loans, the evidence defeats the Stocks' submission that Fifth Third abused that discretion or employed it in a manner inconsistent with the parties' expectations. The Stocks do not argue that Fifth Third improperly withheld funds when West Irving or G.I. Tech possessed adequate collateral. Instead, the Stocks contend that if Fifth Third, as the companies' supposed partner, had "managed [the funds] better … [,] these guarantees certainly would not be where they are today." Tr. 21:1-4 (Defendants' opening statement).

Fifth Third, however, was not responsible for handling West Irving's or G.I. Tech's funds; instead, it loaned the companies money based on the value of the companies' assets. Exh. H at 1. And given the dire financial circumstances faced by West Irving and G.I. Tech, it was not unreasonable for Fifth Third to withhold additional funding. West Irving had lost its largest client, was at risk of losing its second largest client, was not receiving new business, had cash flow problems, and had defaulted on its loans. G.I. Tech had lost its largest client and had defaulted on its loan. Fifth Third was not responsible for the economic collapse or the resulting defaults that doomed both companies, and thus it did not abuse its discretion when withholding additional funds or in declining to finance the West Irving consolidation.

-22-

Additionally, there is no proof of a partnership through which Fifth Third owed a separate duty of good faith and fair dealing. Without written evidence that Fifth Third intended to form a partnership upon lending money to West Irving and G.I. Tech, the ICAA forecloses the Stocks' claim. *See Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 757 (7th Cir. 2001) (rejecting good faith and fair dealing claim under the ICAA); *Whirlpool Fin. Corp.*, 96 F.3d at 225-26 (rejecting good faith and fair dealing defense where the debtor claimed that $17.5 million in financing did not constitute a loan, but rather an investment in his company, and holding that "[b]ecause the Credit Agreements Act prohibits a debtor from defending on the basis of an oral promise," the defense was precluded); *First Nat'l Bank in Staunton v. McBride Chevrolet*, 642 N.E.2d 138, 141-42 (Ill. App. 1994) (invoking the ICAA in rejecting a good faith and fair dealing counterclaim where the bank returned a check because of insufficient funds, allegedly in contravention of the parties' practice to forego return until adequate funds existed); *Household Commercial Fin. Servs. Inc. v. Suddarth*, 2002 WL 31017608, at *4, *6 (N.D. Ill. Sept. 9, 2002) (holding that the ICAA prohibited the borrower's argument that the bank "breached its duty of good faith and fair dealing by falsely promising that [the bank] would not withhold credit and then withdrawing credit and declaring ANHM in default").

### D.     Civil Conspiracy

The fourth affirmative defense alleges that Fifth Third and Silverman Consulting engaged in a civil conspiracy (1) to deprive West Irving of money by requiring it to hire Silverman and (2) to undermine West Irving's business by refusing to issue checks unless Silverman approved them. Doc. 90-6 at 34-35. "To show a civil conspiracy, [the Stocks] must show an agreement to accomplish either an unlawful purpose or a lawful purpose by unlawful means." *Mosley v. City of Chicago*, 614 F.3d 391, 399 (7th Cir. 2010) (citing *McClure v. Owens*

-23-

*Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999)).  The Stocks also must demonstrate

that each alleged conspirator "knowingly and voluntarily participated in a common scheme to

commit an unlawful act or a lawful act in an unlawful manner."  *Id*. at 399-40 (internal quotation

marks omitted).

   The Stocks' conspiracy defense fails for several reasons.  First, as noted above, by

signing the Reaffirmation Agreement, Daniel waived any claim or defense premised on the

Silverman engagement.  Second, as also noted above, West Irving decided to hire Silverman on

its own accord.

   Third, there is no evidence of an agreement between Silverman and Fifth Third to

accomplish an illegal purpose or to accomplish a lawful purpose by unlawful means.  Instead,

Daniel testified that West Irving hired Silverman to audit its expenditures and to help it "return

to a profitable status."  Tr. 90:24-91:12, 92:18-22 (Daniel).  Silverman, moreover, was hired

after West Irving had lost a business partner, had been forced to expend substantial sums of

money to take over the partner's operations, and had defaulted on its Fifth Third loans.  Tr.

87:16-88:12 (Daniel).  The mere fact of ongoing communication between Silverman and Fifth

Third cannot alone establish a conspiracy.  *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir.

2003) ("the existence of numerous phone calls between alleged conspirators, standing alone,

merely proves that the individuals remained in contact.  To assert that the calls are evidence of a

conspiracy is simply speculation …..") (citations, alterations, and internal quotation marks

omitted); *Wilson v. O'Brien*, 2011 WL 759939, at *7 & n.6 (N.D. Ill. Feb. 25, 2011) (noting that

"the standards of proof for both federal conspiracy and civil conspiracy under Illinois law are

essentially the same," and that contact between parties does not establish that they are engaged

in a conspiracy).

-24-

More telling, West Irving supported Silverman's recommendations while Fifth Third did not. Tr. 156:17-157:5 (Smith). Silverman recommended consolidation as a means of returning West Irving to profitability. Fifth Third rejected the proposal because it did not wish and was not obligated to expend the $1 million to $1.5 million necessary to achieve consolidation. Tr. 93:4-6 (Daniel); Tr. 167:4-7 (Smith). Given that the alleged conspirators diverged so totally and that *West Irving* was the primary proponent of Silverman's recommendations, the civil conspiracy theory is implausible. Finally, to the extent that the Stocks argue that it was unlawful for Fifth Third to hold checks until Silverman approved them, the evidence disproves the notion that Silverman approved any checks or that the checks were held for approval. Tr. 212:18-213:5 (Bork).

## Conclusion

With respect to the West Irving Guaranty, West Irving's indebtedness to Fifth Third amounts to several million dollars, but $2.2 million is the limit of Daniel's obligation under the guaranty. Pl. Exh. A at 7 ("Notwithstanding anything herein to the contrary, the obligations of Guarantor hereunder shall be limited to the aggregate amount of $2,200,000, but only to the extent required to pay the Liabilities in full."). Accordingly, judgment is entered in favor of Fifth Third and against Daniel in the amount of $2.2 million.

With respect to the G.I. Tech Guaranty, G.I. Tech's indebtedness to Fifth Third as of June 8, 2010, amounted to $1,041,295.41. The G.I. Tech Guaranty provides that Daniel and Debra "will not only pay [G.I. Tech's indebtedness to Fifth Third], but will also reimburse the Bank for accrued and unpaid interest, and any expenses, including reasonable attorneys' fees, that the Bank may pay in collecting from the Borrower or the Guarantors or any of them, and for liquidating any collateral securing [G.I. Tech's indebtedness]." Pl. Exh. G at 1. Accordingly,

-25-

judgment is entered in favor of Fifth Third and against Daniel and Debra, jointly and severally,

in the amount of $1,041,295.41, plus the interest that accrued under the G.I. Tech Credit

Agreement after June 8, 2010, and collection costs, including attorney fees.

February 15, 2013

_____

United States District Judge